# CHARLESTON.

## COLLINS v. FEATHER.

Submitted June 10, 1902.   Decided December 6, 1902.

1. WILL—*Legatees.*

Where a bequest is to one or more persons living, and to the children of another who is dead, whatever may be the relations of the parties to each other, the legatees will take *per capita,* unless it appears from the context or some clause in the will, or from the circumstances in view of which it was made, shown by competent extraneous evidence, that the testator intended a *stirpital* distribution. (p. 117).

2. WILL.

A testator having two sons and two daughters living, eight grandchildren of a deceased daughter, and the widow and two children of a deceased son, to provide for, gave to one of the sons valuable real estate and one thousand dollars out of his personal estate; to the other valuable real estate, imposing upon him, as a condition subsequent, the support of his mother, testator's widow; and to the widow of the deceased son and her two daughters other real estate; and then disposed of the residuum of his estate as follows: "I will and bequeath that after all the bequests of this, my last will, is complied with, that the remainder of my personal property be equally divided between my children, and grandchildren of my daughter Sarah, who was married to Henry E. Cale; to my daughter Mary Jane, now married to Ethbell Falkenstein; my daughter Margaret, now married to Joseph Michael; J. W. Feather and Michael E. Feather, I will and bequeath that my two daughters, Margaret Michael and Mary Jane Falkenstein each receive one thousand dollars apiece out of my personal property before the above last named division is made." *Held:* That each of the eight

children of Sarah Cale takes one-twelfth of the personal property, after payment of the specific legacies charged thereon. (p. 119).

Appeal from Circuit Court, Preston County.

Bill by Flora Collins and others against Joseph Feather's executors and others. Decree for defendants, and plaintiffs appeal.

*Reversed.*

E. H. SINCELL, P. J. CROGAN, and A. J. KELSOE, for appellants.

NEIL J. FORTNEY and A. G. DAYTON, for appellees.

POFFENBARGER, JUDGE:

The only question brought up on this appeal, is the construction of the fourth clause of the will of Joseph Feather. It arises upon a bill to surcharge and falsify a settlement made by the executors of the will. Upon that bill, the court decreed a distribution *per stirpes* of the *residuum* of the personal estate, disposed of by said fourth clause. Insisting that said distribution should have been *per capita*, the plaintiffs have appealed from the decree.

The testator died July 1, 1896, owning a large amount of property, both real and personal, leaving surviving him Lydia Feather, his widow, Michael E. Feather, J. Wesley Feather, Mary J. Falkenstein and Margaret Michael, his surviving children; Rebecca F. Feather, widow of his deceased son, John H. Feather, Nitia Berry, wife of W. H. Berry, and Dessie Feather, children of said John H. Feather, deceased; Flora Collins, Norma Cuppett, Dora Jenkins, Maud M. Leighton, Charles H. Cale, Blanche Cale, Josie Cale, and Lizzie Cale, children of Sarah Cale, deceased, who was a daughter of the testator. These children of Sarah Cale, deceased, were plaintiffs below and are the appellants here.

By his will, made on the 16th day of December, 1895, the testator provided in the first clause for the payment of his debts and funeral expenses; in the second he devised certain real estate, and bequeathed one thousand dollars out of his personal estate, to his son, Michael E. Feather; in the third, he devised

certain other real estate to his other son J. W. Feather; in the fifth he devised to his granddaughter, Nitia Berry, a one-half interest in the house and lot, where testator resided; in the sixth, he devised to his daughter-in-law, Rebecca, widow of his deceased son, J. H. Feather, and her daughter, Dessie Feather, his one-half interest in the Forman farm, on which they then resided; and in the seventh he required his son, J. W. Feather, to provide for, and take care of, his widow and made his failure to do so a condition subsequent upon which his said son should forfeit the devise to him in favor of his mother, testator's widow.

By the fourth clause he disposed of the residuum of his personal estate as follows:

"I will and bequeath that after all the bequests of this, my last will, is complied with, that the remainder of my personal property be equally divided between my children, and grandchildren of my daughter Sarah, who was married to Henry E. Cale; to my daughter Mary Jane, now married to Ethbell Falkenstein, my daughter Margaret, now married to Joseph Michael, J. W. Feather and Michael Feather, I will and bequeath that my two daughters, Margaret Michael and Mary Jane Falkenstein each receive one thousand dollars apiece out of my personal property before the above last named division is made."

On the 11th day of January, 1896, by a codicil, he gave certain property to his wife, as an additional provision for her, including a one-half interest in a house and lot, for her natural life, and after her death to the said Nitia Berry. This codicil concluded as follows: "My personal property not provided for above, I will that the same be sold and the proceeds arising therefrom to be equally divided among my said heirs above named, after said bequests above stated are complied with." By another codicil, made on the same day, he named his sons, J. W. Feather and M. E. Feather, to be the executors of his will.

The appellants insist upon the rule that, where a devise or bequest is made to a person and the children of another, or to a person described as standing in a certain relation to the testator, and the children of another person standing in the same relation, as to "my son A and the children of my son B," the devisees take *per capita*, A taking only a share equal to that of

each of the children of B. This principle is stated in 2 Jar. Wills, 5 Am. Ed. 756, where numerous authorities are cited in support of it. All the cases there cited are from the English reports, but at page 671, there is a long line of American cases to the same effect, among which are *Brewer* v. *Opie,* 1 Call 184; *Crow* v. *Crow,* 1 Leigh 74; *McMaster* v. *McMaster,* 10 Grat. 271; decided by the court of appeals of Virginia. In 2 Min. Ins., 3d Ed. 1062, the same Virginia cases are cited and this author states the proposition in the following language:. "In like manner, as a general rule, in a devise or bequest to several persons, in terms indicating that they are to take equally, as tenants in common, they take *per capita;* and the same rule prevails whether the ·devise or bequest is to one who is living, and the children of another who is dead; and that without regard to the relation of the parties to each other."

For the appellees it is insisted that the weight of American authority is against this rule, and, owing to the principle of equality imbedded in our law of descents and distribution, thus abolishing the favoritism shown by the English law to the eldest son, under the right of primogeniture, there is a presumption in favor of equality which impels the courts to so construe such bequests as the one under consideration here that the beneficiaries will take *per stirpes.* The rule of construction contended for is stated by Blandford, J., in *Frazer* v. *Dillon,* 3 S. E. 695, (78 Ga: 474), as follows: "In the absence of anything in the will to the contrary, the presumption is, that the ancestor intended that his property should go where the law carries it; it is supposed to be the channel of natural descent. To interrupt or disturb this descent, or direct it in a different course, should require plain words to that effect. He cites *Wright* v. *Hicks,* 12 Ga. 163; *Fenner* v. *Payne,* 81 N. Y. 281; *Lyon* v. *Acker,* 33 Conn. 222; *Brenneman's Appeal,* 40 Pa. St. 115. The same proposition is laid down in *Fissell's Appeal,* 27 Pa. St. 55, in the following terms: "In construing devises or bequests in favor of the next of kin, the court has regard to the legal and customary principles governing the descent and distribution of estates which is according to classes, and is presumed to be the intention of a testator, unless the contrary appears." This is quoted in *Ross's Exrs.* v. *Kiger,* 42 W. Va. 402, 412. There, *Balcom* v. *Haynes,* 14 Allen 205, and

*Holbrook* v. *Harrington,* 16 Gray 102, are also cited. Such seems to have been the rule applied in *Lott* v. *Thompson,* 15 S. E. 278, (36 S. C. 38), and in *White* v. *Holland,* 18 S. E. 17, (92 Ga. 216).

Undoubtedly, there is such a rule of construction as is mentioned in these cases. But, ordinarily, the courts apply it under restrictions, and, in some of the cases just mentioned, it may have been carried rather beyond the limits originally prescribed to it. In note 18, page 619, 2 Jar. Wills, it is said: "It may be added that a gift is often made by will to the heirs of another. In these cases a distinction as to the proportions taken will depend upon whether the ancestor be living or deed at the time of testator's death. In the former case, his heirs will take *per stirpes;* in the latter *per capita.* 2 Prest. on Est. 21-26; 2 Redf. Wills 34." At the end of the note it is further stated that, "The rule may be considered as established that, in a devise to heirs, 'the law presumes testator's intention to be that they shall take as heirs would take by the rules of descent,'" citing a number of decisions of reputable American courts. It is to be noticed here that in the devises and bequests to which this rule of construction is applied, the technical term "heirs" is used and not the word "children," found in the clause now under consideration. In *Lott* v. *Thompson,* cited, the word "heirs" was used in reference to persons whose ancestor was living and who, by reason thereof, would have taken *per stirpes* under this rule. As falling under it, the case of *Hoxton* v. *Griffiths,* 18 Grat. 574, is cited. A careful reading of the opinion in that case will show that the court found that the testator, by other clauses of his will, had expressed the intent that there should be a *stirpital,* and not a *per capita,* division. Hence, it seems to be an erroneous classification. *Ross's Exrs.* v. *Kiger,* 42 W. Va. 402, recently decided by this Court, and in which the testatrix disposed of the residuum of her estate by directing it "to be equally divided between my heirs and my husband's heirs," falls within the terms of the rule of presumption above referred to. The distinction between the use of the word "heirs" and the word "children" is a most important one and cannot safely be overlooked in the construction of wills. "Like all other legal terms, the word *heir,* when unexplained and uncontrolled by the context, must be interpreted

according to its strict and technical import; in which sense it obviously designates the person or persons appointed by law to succeed to the real estate in case of intestacy." 2 Jar. Wills, .585. 2 Min. Ins., at page 1064, says: "If the testator uses legal or technical phrases only, his intention should be construed by legal rules; and if he uses common words, his intention should be regulated according to the common understanding thereof. But whilst technical words are presumed to be used according to their technical signification, unless the contrary appears (for the courts have no right to suppose that the party did not understand the meaning of the words employed, or that he did not mean what the words properly import) ; yet where other expressions are used in conjunction with such technical words, which plainly indicate what the intention was, and that it was not in accordance with the technical signification, the intention will control the legal operation of the words."

It is also very well settled that, in endeavoring to ascertain what the intention of the testator was, his intention being acknowledged upon all hands to be the true test and proper guide in determining the meaning of the will, the courts will take into consideration the circumstances surrounding the testator at the time he made the will, or in view of which he made it, the nature and value of his estate and the relations which he sustained to the persons to whom his property is given. An examination of the decisions, construing testamentary clauses like, and similar to, the one now under consideration, shows that this extrinsic evidence has been given great weight in some of them at least. A striking example of this is *Hamlett* v. *Hamlett,* 12 Leigh 350, in which, unfortunately, the opinion showing the reasoning of the court in arriving at the decision was mislaid and never reported. But the syllabus and the argument of counsel reported clearly shows that what is here said of it is true. The clause construed there reads as follows: "My desire is, that after the decease of my wife, the whole of my estate, except the part hereinbefore disposed of, may be divided in manner and form following, viz: equally among James Hamlett, Mary Jeffress, Patsey Wilson, Nancy Jeffress, Narcissa Jeffress, the children of my son George Hamlett and Lucy his wife, the children of my daughter Elizabeth Averett,

the children of my son Bedford Hamlett, deceased, and the children of my daughter Obedience." Clearly, the rule relied upon by the appellants; applied to the language of this clause, would have resulted in a *per capita* division. But the court held that the testator intended a *stirpital* division, and, in the syllabus, it is recited that the five children named as takers under the will had among them thirty-one children, while four sets of grandchildren named in the will, numbered twenty-one, at the time of the testator's death, and five more were born before the death of the widow, the date fixed for the division; so that, under a *per capita* division, there would have been thirty-one shares of which only five would have gone to the children of the testator, who had thirty-one of his grandchildren dependent upon him, while the other grandchildren, representing only four of the testator's children, would have taken over five-sixths of the assets. A later Virginia case in which the court held that a *per capita* division was intended, is that of *McMaster* v. *McMaster*, 10 Grat. 275. There, the clause construed read as follows: "I will and bequeath to the children of Arthur McMaster and to Robert B. McKee McMaster all the funds remaining after every just claim has been satisfied, to be equally divided between them." Arthur McMaster had five children of whom Robert B. McKee McMaster was one, and David McMaster also had five children. The testator had already given Robert B. McKee McMaster a plantation and two thousand dollars, but he claimed, under this clause, one-third of the residuum, upon the theory of a division *per stirpes*. The court, however, held that the property should be divided into ten shares, giving one to each of the ten children. In *Crow* v. *Crow*, 1 Leigh 81, the clause construed read as follows: "I devise and direct, that the balance of my slaves shall be equally divided between my children, to-wit, the heirs of William Crow, namely, William, Robert, Patsey, Nancy, Henry, Ennis and John, (heirs of William Crow deceased), Thomas, Moses, John Crow, and the children of my deceased daughter Massay Jones, and the children of my deceased daughter Sarah Crane, to them and their heirs; but the children of my daughter Massey Jones are to take only such part as their mother would take if she was still alive, that is to say, a child's part; and in like manner, the children of my daughter Sarah Crane are to take only such part

as their mother would take, if she was still alive, that is to say, a child's part." The court held that the seven children of the deceased son took equally *per capita* with the testator's three living sons and the children of his two deceased daughters took *per stirpes,* each set, their mother's part. It is to be noted here that the testator, in making his gift to the children of William Crow, deceased, designated them as heirs, using that word twice in reference to them, and that, the gift to the children of the deceased son is construed in accordance with the principle laid down in note 18, page 619, 2 Jar. Wills. But the decision of that case is not based upon that rule. It rests upon the principle which the appellants claim as decisive of this case, for Judge Carr, in delivering the opinion of the court, cites some of the same cases that are given by Jarman in support of his text, one of which is *Blackler* v. *Webb,* 2 P. Wms. 383, the doctrine of which was strongly invoked and relied upon by those who contended for the *per capita* division in *Hamlett* v. *Hamlett,* cited. However, the learned judge who delivered the opinion in that case did not ignore the rule relating to the presumption based upon the statute of distribution. On the contrary, he admitted it, but seems to have considered it unimportant, in view of the positive terms of the clause he was construing. His language is, "The cases all lay it down, that where a legacy is to several, whatever may be their relations to each other, or however the statute of distribution might operate upon such relations, equality shall be the rule, unless the testator has established a different one."

But the rule upon which the appellants stand is not more firmly established, nor extensively recognized, than is another rule which, when applicable, compels it to yield. At page 577, 2 Jar. says: "But this mode of construction will yield to a very feint glimpse of a different intention in the context." Then a number of illustrations are given. One is that where the annual income, until the distribution of the capital, is applicable *per stirpes,* it is a sufficient ground for the presumption that the same method of division was intended to govern the gift of the capital. So, also, where the share of one of the takers, upon a contingency, is given over to the others *per stirpes;* where the gift to the children is substitutional, as where it is to several of their children; and where there is a clause providing

that one set of children shall take their parents' share. *Hoxton* v. *Griffith,* cited, is a case in which this is clearly illustrated. The will in that case contained these clauses: "Should any of the children of Dr. and Eliza Hoxton die without heirs, the property left them shall be divided among the survivors. If I should survive my dear E. C. Griffith, it is my will that the property left him in this will should be divided between his three children, Frederick, Eleanor, and David." Of those two clauses, the court said in part: "These clauses indicate clearly the purpose of the testatrix to distinguish the objects of her bounty into two classes—the children of her deceased niece being one class, and her nephew (or, in case of his death, his children), being the other." It was these and other clauses found in the will tending to show the same general intent, that determined its construction in favor of a stirpital distribution. In the opinion, the general rule is stated and upheld in the following strong terms: "Where a bequest is made to several persons, in general terms indicating that they are to take equally as tenants in common, each individual of course takes the same share; in other words, the legatees will take *per capita.* The same rule applies where a bequest is to one who is living, and to the children of another who is dead, whatever may be the relations of the parties to each other, or however the statute of distributions might operate upon those relations in case of intestacy. * * * The substance of this rule of construction is, that, in the absence of explanation, the children in such a case are presumed to be referred to as individuals, and not as a class, and that the relations existing between the parties, and the operation which the statute would have upon those relations in case of intestacy, are not sufficient to control this presumption." The learned judge then passes into a discussion of the exception which has been referred to and within which he placed that case in the manner hereinbefore indicated, and gave numerous illustrations of it found in the reported decisions.

The review and analysis of the Virginia cases bearing upon this question, here given, fully warrant the assertion that, in them, little, if any, weight is given to any presumption arising from the statutes of descents and distributions. As has been shown, it was expressly subordinated to the general rule in two of them, while in *Hamlett* v. *Hamlett,* the decision clearly ap-

pears to have been determined by the light thrown upon the terms of the will by circumstances appearing from the extrinsic evidence introduced. Although the construction of that case harmonizes with the statute, it seems not to have resulted from any presumption arising therefrom, but rather from the hardship and manifest injustice which would have been wrought by a different construction, and so great that the testator could not have intended it, although upon its face, the will indicated it. The only case decided by this Court that bears any sort of relation to this question, is *Ross's Exrs.* v. *Kiger,* cited, and, as has been shown, it falls under a rule somewhat different from both of the rules contended for by the parties to this suit. The language of the clause so construed is, "The balance of property, land and money in notes to be equally divided between my heirs, and my husband's heirs." There are numerous precedents for holding that, when the gift is to heirs, "the law presumes the testator's intention to be that they shall take by the rules of descent." See *Rand* v. *Sanger,* 115 Mass. 124, where the property was directed "to be equally divided among those persons who shall be my legal heirs at the time of my decease;" *Wintermute* v. *Snyder,* 2 Gr. Ch. (N. J.) 489, where the property was "to be divided share and share alike between the heirs of Joseph (deceased) William and his heirs, and Peter and his heirs;" *Miller's Appeal,* 35 Pa. St. 323, where the gift was "to my two brothers and their heirs," although the brothers died before the testator; *Templeton* v. *Walker,* 3 Rich. Eq. 543, where the gift was "to the future heirs of my daughter's body;" *Britton* v. *Johnson,* 2 Hill (S. C.) 430, where the gift was to "my children or their heirs;" *Lowe* v. *Carter,* 2 Jones Eq. 377, where the gift was "to the bodily heirs of my three daughters;" *Burgin* v. *Patten,* 5 Jones Eq. 426, where the gift was "to be equally divided amongst my heirs;" *Bassett* v. *Granger,* 100 Mass. 348, a bequest "to the heirs of my late husband and to my heirs equally;" *Holbrook* v. *Harrington,* 16 Gray 102, where the legacy was directed "to be equally divided between the heirs of A and the heirs of my brothers and sisters." However, this rule is not inflexible. It often yields to the force of extrinsic circumstances, casting light upon the question of the testator's intent, and expressions in the context tending to show an intent inconsistent with it. See *Ward* v. *Stow,* 2 Dev. Eq. 509,

a residuary devise to the "heirs of my brother A, the heirs of my sister B, and to my nephew C;" *Harris* v. *Philpot*, 5 Ired. Eq. 324, where the gift was to the heirs of A, mentioned in the will as living; *Vannorsdall* v. *Vandeventer*, 51 Barb. 137, where the gift was to the heirs of A, B, and C, mentioned in the will as living; *Lemacks* v. *Glover*, 1 Rich. Eq. 141, where the gift was to A for life and after her death to the heirs of her body in fee; *Witmer* v. *Ebersole*, 5 Pa. St. 458, a residuary legacy "to my heirs and my wife's heirs to share equally share and share alike." In all these last mentioned cases and many others, in which similar clauses have been construed, the devisees and legatees took *per capita.*

It would be very great, and practically useless, labor to go through all these cases and endeavor to distinguish them from one another and show why some have been decided in conformity with the rule and others excluded from its operation. No doubt, it could be shown that, in reaching these apparently inconsistent conclusions, the several courts have acted upon varying states of facts which made the rule applicable in some of the cases and forbade its application in others, and that the decisions are not really in conflict. From the review of cases showing the application of the various rules of construction, it is deemed safe to say that there is hardly any such rule that has not its exceptions and that is not excluded from cases apparently falling under its control, by the peculiar provisions of the will and the facts and circumstances in view of which it was made. It is clearly apparent also that, when a testamentary clause falls, by its very terms, within one of these general rules of construction, and there is no other clause in the will, nor anything in the context, nor anything appearing from competent extrinsic evidence, by which it can be taken out of the operation of that rule, the court can do nothing but apply the rule. While, ordinarily, these rules of construction are not rules of property, but only means and agencies created by the courts to enable them to ascertain the intent of the testator and determine what he really meant by the words written in his will, yet, if they are to be disregarded and laid aside, the courts have nothing to guide them in disposing of questions of the gravest import and directly affecting vital interests of the citizen, nor is there anything by which the correctness of a

decision may be tested or known. The courts would have but little to do, in cases of this kind, other than to say whether or not, under the circumstances, they would have made the same sort of a will. "It is plain that such rules are necessary, in order to insure just and uniform decisions. * * * It will be discovered that the maxims and rules which are thus laid down are not arbitrary, but are all suggested, or at least justified, by sound sense and rigorous logic." 2 Min. Ins. 1058-59. They are the creation of the best thought, and the brightest minds, that have adorned and illuminated the English and American bench and bar. They have been wrought out by the great minds which constructed our system of jurisprudence. Their necessity was felt at the very beginning, and time and experience have not only demonstrated their continued necessity, but have added to them and systematized and perfected them.

It is not contended that there is any clause in this will which shows, or tends to show, an intent that the children of Sarah Cale should take as a class. No clause appears in it similar to those found in the will construed in *Hoxton* v. *Griffith,* and which took that will out of the general rule. Nor is it contended that there is anything in the circumstances under which the will was made, or surrounding the testator, at the time it was made, tending to show that he intended that the children of the daughter should not take *per capita.* The argument which seems to have prevailed in *Hamlett* v. *Hamlett,* cannot be invoked here. The testator had made liberal provisions for his two sons. To Michael, he had given the Jesse Forman place and three undivided shares in the Sterling Graham farm and one thousand dollars out of the personal estate. To his other son, J. W. Feather, he had given the Beaghly farm, another farm near Bruceton Mills and all the town lots owned by the testator in the town of Cranesville. To each of his two living daughters, he had given one thousand dollars, out of his personal estate. To his granddaughters, Nitia Berry and Dessie Feather, and his daughter-in-law, Rebecca Feather, he had given considerable real estate. Aside from what the children of his daughter Sarah were given by the fourth clause of the will, disposing of the residuum of the testator's estate, these grandchildren were given nothing. It might be regarded as significant, and as an argument in favor of the construction

contended for by them, that they represent the only child of
the testator, for whose interest no special provision is made in
the will, and is wholly dependent upon what is given by said
fourth clause. While the children of his deceased son took
nothing under this clause, the testator specifically devised to
them a part of his real estate. If these facts are entitled to
any weight, as bearing upon the intent of the testator, their
tendency is in favor of the appellants. But it must be admitted
that the tendency is not strong, for the reason that the pro-
vision made for the two living daughters is apparently meagre
as compared with what the sons received. Assuming that
there is a fund of ten thousand dollars to be distributed under
said fourth clause, the children of Sarah Cale would take six
thousand six hundred and sixty-six dollars and sixty-six and two-
third cents of it, while the four living children of the testator
would take the balance, three thousand three hundred and
thirty-three dollars and thirty-three and one-third cents, a little
over eight hundred dollars each, making the total amount to
each of the daughters only about one thousand eight hundred
dollars, as against six thousand six hundred and sixty-six dollars
and sixty-six and two-third cents, to the daughter represented
by the eight grandchildren. This, it may be said, is inequitable
and unjust and, therefore, never was intended by the testator.
But how are we to determine what were the views of the tes-
tator concerning the equity of the disposition of his property?
May he not have said, these grandchildren are motherless, some
of them are infants and helpless, their necessities and their
helplessness demand more ample provision for them than for
the married daughters? Is the court to make the will speak
so as to work out its own conclusion as to what would have been
just and equitable, or shall it give effect to what the testator
has said, as determined by a rule of construction which is the
outgrowth of centuries of experience and the world's best jurid-
ical thought, and thereby enforce the legally expressed in-
tention of the testator? There can be no doubt that the latter
course is the correct one.

But the brief of counsel for appellees is an argument against
the existence, in this country, of the rule laid down in 2 Jar-
man, at page 756. Hence, as admitted in the briefs, the only
question is, whether that rule has been abrogated in this

country, and replaced by another rule determining that, under a testamentary provision, such as is presented here, the distribution will follow that of the law of descents and distributions, unless a contrary intent is clearly revealed in the context. In support of this *Hamlett* v. *Hamlett, Hoxton* v. *Griffith* and *Ross's Exrs.* v. *Kiger,* are cited. From the explanation of those cases already given, it is clearly apparent that they establish no such rule. In each of them the court reached its conclusion without any, or very slight, reference to the presumption arising from these statutes. *Frazer* v. *Dillon,* already referred to, fully supports the contention of the appellees. There, Blandford, Judge, speaks of the rule contended for by the appellants, as the *dicta* of Mr. Jarman. But *White* v. *Holland* is a later case, decided by the same court, and Lumpkin, Judge, delivering the opinion of the court, refuses to take the advanced ground asserted in *Frazer* v. *Dillon,* and in effect says there was no reason or necessity for asserting it in that case. He refers to two other cases as sustaining that principle and then says: "There are, however, respectable authorities to the contrary, and we do not deem it necessary in the present case to decide this question." This clearly indicates that the rule is not considered as settled in the state of Georgia. *Lott* v. *Thompson,* 36 S. C. 38, seems to rest upon exactly the same grounds and reasons which determined the construction of the will in *White* v. *Holland.* In the latter it was manifest that the testatrix had no desire or wish to alter the distribution which the law would have made, further than to exclude one of her sons from taking any of her estate, but not the children of that son. In the former it appeared that he only desired to alter the laws of descent and distribution to the extent of excluding two of his daughters, but not the children of those two daughters. These cases have little or no bearing on the question under consideration here. If the general plan of the disposition of his whole estate, adopted by the testator in this case, is entitled to any weight in determining what he intended by said fourth clause, it is manifest that it does not argue, in any particular, or in any degree, that he was endeavoring to adopt, to any extent, the disposition which the law would have made of his estate, in case of his dying intestate. He excluded his two daughters entirely from participation in his real estate. In no instance did he

adopt the law of descents in disposing of his real estate, and, in but one instance, did he create a tenancy in common. In that, he gave to his daughter-in-law, Rebecca Feather, and her daughter, Bessie Feather, his one-half interest in a certain farm, instead of giving it to the daughter absolutely, or to her for life and the remainder to the grandchild. No division was directed anywhere except in said fourth clause, by which he disposed of the larger portion of his personal property. From that, he wholly excluded two of his grandchildren representing his deceased son. On the whole, it is clear that he paid but little attention to the manner in which the law would have disposed of his estate. *Henry* v. *Thomas,* 20 N. E. R. 519, is also relied upon. The clause there construed bequeathed the residue of the estate of the testatrix, "to be equally divided between my brothers and sisters and the children of deceased brothers and sisters and the brothers and sisters of Perry J. Brinegar, deceased, (husband of testatrix) and the children of deceased brothers and sisters of said Brinegar." This is very much like the clause construed in *Fissel's Appeal.* It is unlike this case in that it does not exclude any of the next of kin, either of the testatrix or of her husband. Moreover, the terms used are general, not mentioning even the names of the deceased brothers and sisters. In that case, Olds, Judge, said of the principle relied upon by appellants: "This rule has been so far abrogated by the courts, of the different states, that it no longer has any practical force in the construction of wills and the weight of authority is to the effect that beneficiaries take *per stirpes* unless the language used in the devise or bequest is such as to exclude that intention." He cites *Wood* v. *Robertson,* 113 Ind. 323; *Houghton* v. *Kendall,* 7 Allen 72; *Raymond* v. *Hillhouse,* 45 Conn. 467; *Minter's Appeal,* 40 Pa. St. 114; *Fissel's Appeal,* 27 Pa. St. 55; *Clark* v. *Lynch,* 46 Barb. 68; *Vincent* v. *Newhouse,* 83, N. Y. 505; *Bool* v. *Mix,* 17 Wend. 119; *Alder* v. *Beall,* 11 Gill. & J. 123. In *Houghton* v. *Kendall,* after a life estate to A, there was a gift to her "children who may be the surviving heirs of her body." The rule that, where the gift is to heirs, they shall take as heirs would take, is decisive of that case, independently of the rule insisted upon by appellees. *Raymond* v. *Hillhouse* is the case of a residuary gift, "to be equally divided among my sisters R and S, the grandchildren of my deceased brother W and the

grandchildren of my deceased sisters D and M." The language of this clause clearly separates the beneficiaries into classes, and it was unnecessary to apply any rule or any presumption, although the court did say that, as the rule relied upon by appellants would so easily yield to indications of a contrary intention on the part of the testator, it is reasonable that it should also yield to the presumption in favor of natural heirs or next of kin, for distribution according to the statute, in all cases where the language of the will is consistent with such distribution and the real intention of the testator, is in doubt. In *Minter's Appeal,* the language was clear and explicit—"share and share alike among the children of A and the children of M and to my sister B. * * * Said B. and the children of my said brothers A and M shall have * * * share and share alike among the children of A and the children of M and to my sister B." The same is true of *Fissel's Appeal.* In *Bool* v. *Mix,* the devise was to two daughters for life, "to be equally divided between them and after their decease to their and each of their children to be divided between them share and share alike." Here, there was a direction to divide between the two daughters, and then the remainder is disposed of. This direction of itself was sufficient to indicate that a stirpital division was intended among the children. *Alder* v. *Beal* directed a division "between the children of my sister A and their heirs forever and the children of my sister B and their heirs forever." The use of the word "heirs" sufficiently indicates the intention that the beneficiaries should take *per stirpes.* The same is true of *Swallow* v. *Swallow,* 44 N. E. R. 132, where the testatrix gave one-half of her estate to her heirs and the other half to the heirs of T, "her deceased husband, namely N. S. & D." It is to be noticed that in *Fissel's Appeal* the decision is not based wholly upon the rule contended for by appellees, although it is there stated as broadly as is contended for here; for it is there said, "where the bequest is not to several children of brothers and sisters but to the children of the several brothers and sisters, and the classes are distinguished by the repetition of the words 'and between each of them,' it amounts to a classification and the children in each instance take their parent's share." This makes it clear that the rule of presumption in favor of a statutory distribution, was only given a pursuasive and secondary weight in

the decision. The peculiar phraseology upon which that de-- cision rests is found in some of the cases above mentioned, from which the conclusion is irresistible that the broad language in *Raymond* v. *Hillhouse* and *Henry* v. *Thomas,* asserted upon the authority of these cases, is not fully sustained by them. In other words, it goes further than the cases warranted. It must be admitted that the rule laid down in Jarmon has been approved and applied in Virginia cases, decided before the organization of this State, and which are binding authority upon this Court. They have never been overruled. They ought not to be overruled unless it clearly appears that they are wrong and do not enunciate the law. In view of the array of authorities, American as well as English, upholding the doctrine of these decisions, as compared with the few cases holding the contrary, some of which do not appear to be very maturely considered, this Court cannot consistently overrule them. While, in some instances, the broad principle asserted in opposition to the doctrine of these cases would prove to be equitable and just in its operation, cases will undoubtedly arise in which the strict application of it contended for here would work injustice and inequality. From the examination of the various rules of interpretation of testamentary clauses like this one, it is considered that they afford a better guide in seeking for the intention of the testator, than the single broad principle which, if adopted, would be substituted for more than one of them and would be defective, by reason of its generality.

These views result in the conclusion that the decree of the circuit court is erroneous and should be reversed, and the cause should be remanded for further proceedings in accordance with the views here expressed, and, further, according to the rules and principles governing courts of equity.

*Reversed.*